1   WO

2

3

4

5

6                   IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   Sprint Communications Company, L.P., )   No. cv-06-2064-PHX-ROS
                                         )
10              Plaintiff,               )   **ORDER**
                                         )
11  vs.                                  )
                                         )
12                                       )
    Western Innovations, Inc. et al.,    )
13                                       )
                Defendant.               )
14                                       )
                                         )
15  _____ )

16      Pending before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc.

17  156),  Haydon Building Corporation's ("Haydon") Motion for Summary Judgment (Doc.

18  159), and Western Innovations, Inc.'s ("Western") Motion for Partial Summary Judgment

19  (Doc. 164).  For the reasons discussed herein, each Motion shall be granted in part and

20  denied in part.

21                            I. BACKGROUND

22      On April 11, 2005, while excavating to install an irrigation sleeve for the Town of

23  Gilbert, pursuant to a contract with Defendant Haydon Building Corporation ("Haydon"),

24  Defendant Western Innovations, Inc. ("Western") severed a fiber optic cable owned by

25  Plaintiff Sprint Communications Co. ("Sprint").

26      Haydon served as general contractor for the Pecos Road Realignment and

27  Improvements Project.  Western was contracted with Haydon to provide landscaping for

28  Phase 2 of the project.  At some point between April 5th and April 11th, Haydon asked

Western to install an installation sleeve in the center median of East Pecos Road, approximately 900 feet east of South Greenfield Road in Gilbert. It was in the course of completing this work that the accident occurred.

Neither Western nor Haydon contacted Arizona Blue Stake, a "non-profit communication center" that "performs excavation notification services," to add Western to Haydon's Blue Stake Excavation Ticket. Arizona Blue Stake, "All About Arizona Blue Stake," http://www.azbluestake.com/main/us/mission.html, (last accessed Feb. 5, 2009). Western and Haydon dispute whose responsibility it was to make that call. At some point prior to Western's excavation, Sprint had placed locate marks in the vicinity of its cable; the marks were, apparently unbeknownst to Western, destroyed during Haydon's earlier excavations on the site.

Sprint states that it took 4.76 hours for it to repair the cable on the day in question, during which time it was forced to route its traffic through other of its systems, including dedicated back-up resources.

On August 25, 2006, Sprint filed suit against Western alleging that it was liable under theories of strict liability grounded on the Arizona Damage Prevention Act, A.R.S. §§ 40-360.21 et seq. negligence, and trespass for, the total cost of the repair of the cable, and all other damages incurred by Sprint as a result of the damage to the cable, including loss-of-use damages for the period during which Sprint was forced to reroute its traffic.

During the course of discovery, Sprint received information that Western performed the excavation pursuant to its subcontract with Haydon, and that the Western employees who allegedly severed Sprint's cable were purportedly working under the supervision and control of Haydon. On this basis, Sprint requested, and the Court granted, leave to file an amended complaint adding Haydon as a party. Sprint brought suit against Haydon under strict liability, trespass, and negligence theories. Both Western and Sprint have filed cross claims for breach of contract and seeking indemnity.

The Court subsequently found that Sprint's strict liability claim under the excavation statutes against Western was time barred. (Doc. 49.) On December 3, 2007, Haydon filed

1 a motion for judgment on the pleadings, seeking to have Sprint's strict liability claim against

2 it dismissed on the same basis. (Doc. 77.).  That Motion was granted. (Doc. 119).

3                                                                II. ANALYSIS

4                                                          A. Standard of Review

5          A court must grant summary judgment if the pleadings and supporting documents,

6 viewed in the light most favorable to the non-moving party, "show that there is no genuine

7 issue as to any material fact and that the moving party is entitled to a judgment as a matter

8 of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

9 Substantive law determines which facts are material, and "[o]nly disputes over facts that

10 might affect the outcome of the suit under the governing law will properly preclude the entry

11 of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In

12 addition, the dispute must be genuine; that is, "the evidence is such that a reasonable jury

13 could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

14          The party opposing summary judgment "may not rest upon the mere allegations or

15 denials of [the party's] pleading, but . . . must set forth specific facts showing that there is a

16 genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith

17 Radio Corp., 475 U.S. 574, 586-87 (1986).  There is no issue for trial unless there is

18 sufficient evidence favoring the non-moving party; "[i]f the evidence is merely colorable, or

19 is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at

20 249-50 (citations omitted).  However, "[c]redibility determinations, the weighing of the

21 evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

22 of a judge." Id. at 255.  Therefore, "[t]he evidence of the non-movant is to be believed, and

23 all justifiable inferences are to be drawn in his favor" at the summary judgment stage. Id.

24                                                          B. Choice of Law

25          A federal court sitting in diversity must apply the forum state's choice of law rules.

26 Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Orr v. Bank of Am., 285

27 F.3d 764, 772 n.4 (9th Cir. 2002).  Arizona courts apply the rules set forth in the Restatement

28 (Second) of Conflicts (1972) ("Restatement"). Bryant v. Silverman, 703 P.2d 1190, 1191

(Ariz. 1985).  Section 147 of the Restatement governs choice of law concerning injuries to tangible things:

> In an action for an injury to land or other tangible thing, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles states in § 6 to the occurrence, the thing and the parties, in which event the local law of the other state will be applied.

Here, there is no question that the harm occurred in Arizona.  Nor has any party contested that another state has a more significant relationship with the parties or the occurrence. Accordingly, Arizona law shall be applied.

### D. Negligence Per Se[1]

Sprint argues that Western and Haydon are per se negligent due to their violations of the Arizona Damage Prevention Act, A.R.S. §§ 40-360.21 et seq.  "It is the prevailing rule, recognized in Arizona, that a breach of a statute intended as a safety regulation is not merely evidence of negligence but is negligence per se."  Brannigan v. Raybuck, 667 P.2d 213, 217 (Ariz. 1983) (citing Orlando v. Northcutt, 441 P.2d 58, 60 (Ariz. 1968); W. Prosser, *Handbook of the Law of Torts* § 36 at 197-200 (4th ed. 1971)).  Negligence per se requires a "*specific* requirement of a law or an ordinance."  Griffith v. Valley of Sun Recovery & Adjustment Bureau, 613 P.2d 1283, 1285 (Ariz. App. 1980).  Where a statute:

> does not proscribe certain or specific acts, but defines a standard of conduct against which the jury must measure the party's conduct, a finding that the party violated the statutory standard is a finding that the party was *negligent*. The words "per se" add nothing to the word negligent in this case . . . .

Deering v. Carter, 376 P.2d 857, 860 (Ariz. 1962).  A statute that allowed secured parties to repossess collateral "without judicial process if this can be done without breach of the peace," for instance, did not ground a finding of negligence per se as it did not proscribe certain or specific acts in order to maintain the peace.  Griffith, 613 P.2d at 1285-86.

---

[1] Sprint also states that it is entitled to summary judgment on its claim under A.R.S. § 40-360.23(C) against Haydon.  This claim is subject to the same statute of limitations.

- 4 -

Unless the statute in question imposes an absolute duty, "its violation may be excused when, for example, the defendant was 'unable after reasonable diligence to comply.'" Brannigan, 667 P.2d at 218 (citing the Restatement (Second) of Torts § 288 A, comment b (1965)).

Here, the statute at issue is Arizona's Damage Prevention Act. See A.R.S. §§ 40-360.21 et seq. The statute states:

> A person shall not make or begin any excavation in any public street, alley, right-of-way dedicated to the public use or public utility easement or in any express or implied private property utility easement in any apartment community or mobile home park without first determining whether underground facilities will be encountered, and if so where they are located from each and every underground facilities operator and taking measures for control of the facilities in a careful and prudent manner.

A.R.S. § 40-360.22(A). It further specifies that:

> If any underground facility is damaged by any person in violation of this article as a result of failing to obtain information as to its location, failing to take measures for protection of the facilities or failing to excavate in a careful and prudent manner, the person is liable to the owner of the underground facility for the total cost of the repair of the facility.

A.R.S. § 40-360.26(A). These provisions create a clear and specific duty on the part of excavators to ascertain the location of underground facilities prior to excavating, and specifically provide for liability should they not. An Arizona appellate court that considered the issue agreed, writing of the provisions that "it is apparent that they were designed to provide a cause of action against those people who carelessly or negligently excavate in an easement to the damage of a utility located therein." Sedona Self Realization Group v. Sun-Up Water Co., 598 P.2d 987, 989 (Ariz. 1979).

Before addressing the merits of Sprint's claim, however, the question of a time bar must be considered. A.R.S § 12-541(5) sets a one year statute of limitations for actions "upon liability created by statute." In its Order of July 24, 2007, this Court ruled that a statutory strict liability claim arising out of A.R.S. §§ 40-360.26 and 40-360.28 was time barred under that one year statute of limitations. If, therefore, Plaintiff's cause of action for negligence per se constitutes "liability created by statute" it is time barred. Conversely, however, actions "for injury done to the estate or the property of another" have a two year

1   statute of limitations and are not time barred.  A,R,S, § 12-542(3).  "Actions other than for
2   recovery of real property for which no limitation is otherwise prescribed shall be brought
3   within four years after the cause of action accrues."  A.R.S. § 12-550.

4        Arizona courts have held that duties of care arising out of statute do, indeed, constitute
5   "liability created by statute."  In Jackson v. Pima County, for instance, the Court found that
6   "any duty owed to [the] Jacksons was created by" the floodplain statutes in question.
7   Therefore, Jackson's "claim of negligence must be brought within the one-year statute of
8   limitations."  767 P.2d 54, 55-56 (Ariz. App. 1988). See also, Taylor v. Betts, 124 P.2d 764,
9   767 (Ariz. 1942) (holding that liability was based on a statute where the "duty imposed upon
10  them was purely a creature of statute and not of the common law."); Owens v. City of
11  Phoenix, 884 P.2d 1100, 1106 (Ariz. App. 1994) (finding "[h]ere, the state had no duty to
12  provide relocation assistance or payments at common law.  Therefore, Owens' negligence
13  claim is governed by the one-year limitations period.").  Accordingly, Plaintiff's negligence
14  per se theory of liability, which clearly arises out of the statute, is time-barred.

15                                    E. Negligence

16       Sprint alleges that Western and Haydon owed Sprint a duty at common law.[2]
17  At common law, excavators have a duty to inform themselves of the location of underground
18  facilities and to take precautions necessary to avoid those facilities.  Mountain States Tel. &
19  Tel. Co. v. Kelton, 285 P.2d 168 (Ariz. 1955) (citing Illinois Bell Tel. Co. v. Chas. Ind. Co.,
20  121 N.E.2d 600 (Ill. App. Ct. 1954); GTE North, Inc. v. Carr, 618 N.E.2d 249, 252 (Ohio Ct.
21  App. 1993); South Central Bell Tel. Co. v. Sewage & Water Bd., 652 So. 2d 1090, 1093 (La.
22  Ct. App. 1995).  An early New York decision summarized what has become the general view
23  on the matter thusly:

24

25

26       [2] Sprint also alleges a duty of care arising out of industry standards and government
27  regulations.  However, it does not, in its Memorandum of Points and Authorities, point to any
    particular standards or regulations violated except those arising out of the statutes discussed
28  above.  Therefore, the Court cannot find that a violation of standards at this time.

                                       - 6 -

> When, therefore, one proposes using the public streets for his private purpose, and proposes driving iron spuds or stakes below the surface, ordinary prudence and care dictate that he should inform himself of what lies beneath, so as to avoid injury to public property, or the property of public service corporations. If he fails to do this, he drives his stakes or make his excavations at his peril.

Frontier Tel. Co. v. Hepp, 66 Misc. 265 (N.Y. Sup. Ct. 1910).

Similarly, "industry standards can be helpful in establishing the appropriate standard of care." Nikolov v. Associated Envtl. Servs., 52 Fed. Appx. 975, 977 (9th Cir. 2002); see also Southwest Auto Painting and Body Repair, Inc. v. Binsfeld, 904 P.2d 1268, 1272 (Ariz. App. 1995) (holding "when a person holds himself out to the public as possessing special knowledge, skill, or expertise, he must perform according to the standard of his profession."). The Telecommunications Industry Association's "Standard for Physical Location and Protection of Below-Ground Fiber-Optic Cable Plant" provides that an excavator should "Provide notice of excavation to all utility owners or to the One-Call notification center" prior to the beginning of any excavation and "[p]rotect and preserve the temporary marking or staking placed by the owner to indicate the location of underground facilities until such markings are no longer needed for safe excavation near the underground facility." CNA Insurance Company's Minimum Damage Prevention Guidelines state that excavators should "[i]nspect the area of proposed excavation to ensure that all utilities have been marked" and "[i]f there are no locates, or if the locates are incomplete, or if exposing indicates the locate marks are not accurate, [the excavator should] not dig, but rather contact the facility owner or the One-Call center." See CNA Standards at pp. 1-5, Plaintiff's Exhibit 25. Similarly, U.S. Department of Transportation's Best Practice for avoiding damage to underground facilities during excavation includes: "Prior to excavating, verify that all utilities have been marked and inspect the area for indications of any unmarked facilities."

Accordingly, the standard of care for excavating in the area of utilities includes: making affirmative efforts to discover the location of all underground facilities in advance; notifying the utility owner and/or the One-Call Center (here Blue Stake) of the excavation in advance; ensuring that locate marks are present and preserving them as needed, and; using non-invasive means such as excavation by hand in the vicinity of the facility.

1

a. Western

2      It is undisputed that Western was excavating with mechanized equipment and severed

3 Sprint's cable.  Similarly, it is undisputed that, Western did not take certain measures to

4 prevent those facilities from being damaged (e.g., contacting the facilities' owners prior to

5 excavation, asking that a representative of those owners be present during excavation, and

6 excavating by hand in order to expose the cable before trenching across it with a backhoe).

7 Further, Western ignored warning tape placed at the site by Sprint that was apparently 30

8 inches above the severed cable and visible in the 18-inch deep surface trench initially dug

9 by Western. Plaintiff's Exhibits 5, 8, 17, 18, 19.  Thus, it violated the duty of care it owed

10 to Sprint.  Nor is there any question that the breach – excavating without making sure it was

11 aware of the buried facilities – was both an actual and proximate cause of the damage.

12      Western argues that it is Haydon that should be held liable for the damages to the

13 cable.  It states that Western Innovations was performing work pursuant to Haydon's

14 direction and therefore:

> (1) had no knowledge that Haydon had destroyed Sprint's Blue Stake markings;
> (2) was not informed that Haydon had destroyed the Sprint markings and could not have known, since the other utility markings were in place;
> (3) was not responsible for contacting Blue Stake or Sprint to have the markings because Haydon represented that Western Innovations would be placing Western Innovations on the Blue Stake tickets; and
> (4) Haydon instructed Western Innovations exactly where to trench despite Haydon's knowledge that the cable was in the path of the trenching and knowledge that the markings had been destroyed.

Haydon, in turn, points to a provision of its subcontractor agreement with Western, which

states:

> Subcontractor shall (a) ". . . comply fully with all laws, citations, rules, regulations, standards and other statutes with respect to occupational health and safety, accident prevention, safety equipment and practices prescribed by Owner, Contractor, Federal, County, City and any other agency or body having jurisdiction or cognizance over the work being performed."

Haydon's Exhibit A.  Haydon further argues that it expected Western to contact Blue Stake

itself and that it relied on Western to comply with applicable statutes.  It also cites to the

15
16
17
18
19
20
21
22
23
24
25
26
27
28

deposition of Plaintiff's Expert Arch York,[3] who stated he didn't have any criticisms of Haydon in his deposition.

Ultimately, Western's allegations regarding Haydon bear not on the fact of Western's negligence – in fact, it did fail to correctly ascertain the location of the cable in spite of a provision in the subcontract that made it clear that it was responsible for carrying out its excavation safely and cautiously and a common law duty to do the same.  Instead, they bear on its proportionate share of liability and on the question of whether Haydon is vicariously liable for Western's actions (see *infra*).

b. Haydon

It is undisputed that Haydon obliterated Sprint's locate marks while performing grading work in the area, was aware of this fact, and requested that Western excavate as quickly as possible in the area all the same without informing Western of the destruction or making an effort to get the marks redone.[4]  Accordingly, summary judgment on the question of Haydon's negligence – though not the degree of Haydon's contribution – is appropriate.

Haydon argues that the fact that it served as an excavator in the earlier phase of work – the work in which the marks were destroyed – does not mean that it was an excavator in the work which actually damaged the cable.  It also notes the above-quoted language in its

---

[3] Haydon has filed a Motion in Limine to Preclude Arch York from Offering Evidence (which alternatively argues that he should not be allowed to offer evidence on matters addressed in his supplemental report).  Given that Haydon cites to and attaches York's deposition in its own brief and given that the District of Arizona's local rules require that motions to exclude evidence used in written motions must be presented "in the objecting party's responsive or reply memorandum," L.R. Civ. 7.2(m)(2), the Court will not consider the Motion in Limine for purposes of deciding this motion for summary judgment.

[4] There is some obfuscation regarding whether the locate marks were actually destroyed.  Haydon states in its Response to Plaintiff's Statement of Facts that a Blue Stake ticket stating "Marks destroyed Plz Remark" is not dispositive of this as "[o]n large projects, including the subject project, Haydon updates its Blue Stake requests routinely and automatically."  Thus, "'Marks destroyed Plz Remark' as indicated on the April 8, 2005 locate request confirm is a default setting or default request used routinely and automatically." (Internal citations omitted.)  However, nowhere in its Response does Haydon actually dispute that the locate marks were, in fact, destroyed.

contract with Western regarding its responsibility for applying with appropriate health and safety regulations.  However, while the Arizona Damage Prevent Action *may* draw a sharp line between those who are actually excavators at a given time and those who are not, the common law duty of care does not.  Given its responsibility to remain in compliance with industry standards regarding locate marks and given its representations to Western, its responsibilities are not obviated by the fact that it was not actually excavating at the time the incident occurred.

There is a genuine question of material fact as to the extent to which Haydon was responsible for supervising Western's excavations.  Western states that it was directed precisely where and how to dig, and Haydon did, apparently, stake the site where it wanted the irrigation sleeve installed.  Haydon, on the other hand, argues that it turned the process over to Western entirely, noting again the contractual provision required Western to assume responsibility for compliance with safety regulations and that Haydon's on-site supervisor, Samples, was apparently well away from the incident site during the excavation.  There is also a genuine issue of material fact as to whether Haydon represented to Western that it would contact Blue Stake prior to the start of Western's excavations.  These questions bear on Haydon's contribution level.

F. Trespass

Sprint argues that Western and Haydon are liable for trespass to chattels.  In Arizona, "the tort of trespass to a chattel may be committed by intentionally dispossessing another of the chattel or using or intermeddling with the chattel in the possession of another."  Cumis Ins. Soc'y, Inc. v. Merrick Bank Corp., 2008 U.S. Dist. Lexis 78451 at * 23 (Dist. of Ariz. 2008) (citing Koepnick v. Sears Roebuck Co., 762 P.2d 609, 617-618 (Ariz. App. 1988); Restatement (Second) of Torts § 217 (1965)).  In Koepnick, the Court noted that "Arizona courts follow the *Restatement (Second) of Torts* absent authority to the contrary."  762 P.2d at 617.  It then cited comment b to § 221 providing that "dispossession may occur when someone intentionally assumes physical control over the chattel in a way which will be destructive of the possessory interest of the other person. . . . [O]n the other hand, an

1    intermeddling is not a dispossession unless the actor intends to exercise a dominion and

2    control over it inconsistent with a possession in any other person other than himself."  762

3    P.2d at 618.

4            Several courts have found that an excavator who damages underground utilities is

5    liable in trespass.  See, e.g., Mountain States Tel. & Tel. Co. v. Vowell Construction Co., 341

6    S.W.2d 148,150 (Tex. 1960) (holding "Destruction of, or injury to, personal property,

7    regardless of negligence may be a trespass.");Pacific Tel. & Tel. Co. v. Granite Constr. Co.,

8    37 Cal. Rptr. 727, 729 (Cal. Ct. App. 1964); United Electric Light Co. v. Deliso Const. Co.,

9    52 N.E.2d 553, 556-57 (Mass. 1943).  Conversely, courts have also declined to extend

10   trespass to analogous fact patterns; an Arkansas court noted that "[o]f the cases compiled at

11   73 A.L.R. 3d 987, six jurisdictions apply the rule of strict liability for trespass, while at least

12   twelve require fault as a basis of recovery."  Arkansas Louisiana Gas Co. v. Central Utilities

13   Constructors, Inc., 643 S.W.2d 566, 567 (Ark. 1982).  That court declined to adopt a blanket

14   rule allowing recovery in trespass.  Id.  Arizona courts do not appear to have considered the

15   question of common law trespass in this context.  To the extent they have considered the

16   issue at all, they have done so in the context of the Damage Prevention Act, A.R.S. §§ 40-

17   360.21 – 40-460.29, writing that "[t]he statute, in effect, provides for strict liability for

18   damages as to those who excavate first and determine later the location of the utilities within

19   the easement."  Sedona Self Realization Group, 598 P.2d at 989.  Given this, this Court

20   declines to find a common law trespass claim which would extend strict liability for damages

21   caused during excavation past what is explicitly provided by statute.  Sprint's trespass claim,

22   therefore, fails.

                                    G. Allocation of Liability

24           The question remains as to the possibility of joint and several liability and as to

25   whether Haydon may be vicariously liable for Western's negligence and trespass.  Arizona's

26   Uniform Contribution Among Tortfeasors Act ("UCATA") has severely limited the common

27   law doctrine of joint and several liability.  As a general rule "[e]ach defendant is liable only

28   for the amount of damages allocated to that defendant in direct proportion to that defendant's

percentage of fault."  A.R.S. § 12-2506(A).  A party "is responsible for the fault of another person, or for payment of the proportionate share of another person," if:

> 1. Both the party and the other person were acting in concert.
> 2. The other person was acting as an agent or servant of the party.

A.R.S. § 12-2506(D).  "Acting in concert" in this context means "entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively taking part in that intentional tort."  A.R.S. § 12-2506(F)(1).  It does not apply to negligence actions.  Id.  Nor does "[a] person's conduct that provides substantial assistance to one committing an intentional tort . . . constitute acting in concert if the person has not consciously agreed with the other to commit the intentional tort."  Id.

A defendant found jointly and severally liable pursuant to subsection D has the right to contribution.  A.R.S. § 12-2506(E).

Here, the parties were not "acting in concert" with each other pursuant to A.R.S. § 12-2506(D) as that section applies only to intentional torts and precludes negligence actions.  A.R.S. § 12-2506(F)(1).

Western may, however, have been acting as an agent or servant of Haydon.  Under Arizona law, an employer is not generally liable for the negligence of an independent contractors unless the situation falls into one of several categories.

Where parties are not found jointly and severally liable, damages are apportioned in direct proportion to that defendant's percentage of fault.  UCATA does not instruct courts to limit liability by "apportioning damage according to causal contribution."  Piner v. Arizona, 962 P.2d 909, 915 (Ariz. 1998).  Thus, UCATA "has left intact the rule of indivisible injury."  Id.

i. Non-delegable duty

An employer will be liable for the acts of a subcontractor if the employer had a non-delegable duty to the public interest.  Wiggs v. City of Phoenix, 10 P.3d 625, 627-28.  Where such a duty exists, the employer may not disclaim that duty through contract.  Id.  The existence of a non-delegable duty often centers around the relationship of the duty-holder to

the property in question.  Municipalities, for instance, have a non-delegable duty to maintain their road systems.  Similarly, a store that chooses to remain open during a renovation has a non-delegable duty to keep its premises safe.  Koepke v. Carter Hawley Hale Stores, 682 P.2d 425, 429 (Ariz. App. 1984).  Here, there is no indication that Western had a non-delegable duty; such a duty has never been defined by statute or common law.  Nor does Haydon fit the pattern of a property owner required to protect the public from a risk created by its property.  This theory, therefore, fails.

### ii. Particular Risk of Harm

If a contractor's work creates a "particular risk" of harm, meaning that if there is a "special, recognizable danger arising out of the work itself," the employer is liable for that harm unless she contractually delegates the risk.  Cordova v. Parrett, 703 P.2d 1228, 1231 (Ariz. App. 1985).  However, that provision – adopted from the Restatement (Second) of Torts, § 416 – has been applied only to a particular risk of *bodily* harm (as the Restatement itself specifies), not at issue here.

### iii. Retained Control

Arizona has also adopted the doctrine of "retained control."  This doctrine is laid out in the Restatement (Second) of Torts, § 414, which states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by [the] failure to exercise [that] control with reasonable care.

See German v. Mountain States Tel. & Tel. Company, 462 P.2d 108, 110 (Ariz. App. 1969).  Comments to Section 414 indicate that it was "intended primarily for application to situations involving several subcontractors doing different parts of the same work under the general superintendence of the principal contractor."  Id. at 111.  Contracts that reserve rights "generally reserved to owners in construction contracts" and "do not give [the employer] any control or right to control the *method or manner of doing* the details of the work, but rather generally relate to the [employer]'s right to make certain that the *results obtained* conform to the specifications and requirements of the contract" are not sufficient to ground a finding

of retained control. Id. at 111-12.[5] Nor does "the right to program or direct the sequence of the work or reserving the right to prescribe changes or alterations" give the employer "the right to control the details of the method or manner of doing the work." Id. at 112 (citing Gallagher v. United States Lines Co., 206 F.2d 177 (2d Cir. 1953)).

There is no evidence that Haydon retained the kind of control over the project contemplated in the statute. Western's supervisor did, apparently, have a copy of landscape plans for the project. Ex. 9. However, the contract between the two parties (see *infra* for a discussion of the applicability of the contract) explicitly made Western responsible for, for instance, complying with safety regulations and does not specify the means or methods of performing the work in great detail. While Haydon's supervisor was present on the day of the accident, there is no indication that he was there to exercise control over the work being done. Further, the equipment used in the dig was rented by Western, not owned or provided by Haydon. Western's Exhibit A., pg. 73-74. Accordingly, the doctrine of retained control does not apply here.

iv. Employer/Employee Relationship

Finally there seems to be an issue as to whether Western was a subcontractor at all. If Western was not a subcontractor and was, in fact, simply an employee, Haydon could be vicariously liable for everything it did in the scope of its employment. Western argues that it "was performing work that was to be performed by another subcontractor on an emergency basis"[6] and provides evidence to the effect that its contract with Western  did not apply to the installation of this particular irrigation sleeve. Western's Exhibit A, pg. 103-05. Conversely,

---

[5] For instance, where an employer "over[saw] the general progress of the remodeling to insure it complied with contract specifications," it could not be held to have retained control because there was "no evidence indicating that Broadway had any authority to direct the manner in which the contractors worked" and because it did "not have extensive control over the activities of [the contractor's] workers" or "work schedules and operational procedures." Koepke, 682 P.2d at 430-31.

[6] It is disputed at what point Western was first asked to install the irrigation sleeve. Haydon states that the request came on April 5th or 6th; Western, April 11th.

the contract included provisions regarding installation sleeves.  If the contract didn't govern the enterprise (or, perhaps, even if it did) it is possible Western was working as an employee rather than a contractor:

In distinguishing between an independent contractor and an employee, Arizona courts "must apply general agency principles, . . . such as those found in the Restatement (Second) of Agency § 220(2) (1957) . . . . Of the considerations employed in reaching a decision under general agency law, the determination of who has the right to control and direct the work is foremost." Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Hatco, Inc., 690 P.2d 83, 87 (Ariz. App. 1984) (citing Associated Gen. Contractors v. NLRB, 564 F.2d 271, 279 (9th Cir. 1977).  A contractor "typically agrees to do certain work for a specified or lump sum amount." Sobel v. Jones, 392 P.2d 415, 416-17 (Ariz. 1964) (citing Fox West Coast Theatres v. Industrial Commission, 7 P.2d 582 (1932)). The Restatement (Second) of Agency § 220 also notes as factors to be considered:

> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed; . . .
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant . . . .

Analysis of these factors does not support a determination that Western was an employee rather than a contractor.  It was a short term job, for which it was paid a lump sum. Western is engaged in a particular skilled obligation.  As discussed above, there is no indication that Haydon retained control over the means and methods of the work.  And the instrumentalities used to accomplish the job were obtained, at least in part, by Western.

Accordingly, there is no genuine issue of material fact as to whether Haydon is jointly or vicariously liable for Western's negligence.

v. Western's Indemnity of Haydon

- 15 -

Haydon contends that it is entitled to contractual indemnity and to common law indemnity pursuant to the subcontract entered into between the parties.  Western, conversely, contends that Haydon is not entitled to contractual indemnity because the job was not covered by the contract and common law immunity because Haydon was actually negligent.  See, e.g., Busy Bee Buffet Inc. v. Ferrell, 310 P.2d 817, 821 (Ariz. 1952) (noting that common law indemnity  is only available where the party to be indemnified is not also negligent in their own right.).  As to the question of common law indemnity, Haydon was negligent itself; it cannot claim a right to common law indemnity.

As to contractual indemnity, Haydon's contract with Western contains the following provision:

> To the fullest extent permitted by law, subcontractor shall defend, indemnify and hold the Contractor and Owner and their agents and employees harmless from all claims, injuries, damages, liability, losses, costs, penalties, expenses and fees (including without lmitation attorney fees) in any way arising out of or resulting from Subcontractor's performance of the Work pursuant hereto, including without limitation any claims, liabilities, losses, costs, expenses and fees associated with the furnishing of labor, materials or rental equipment to or for the benefit of Subcontractor . . . .

Western argues that the work was not actually performed under the contract.  That interpretation, however, is not supportable.  "A general principle of contract law is that when parties bind themselves by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written."  Grubb v. Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C., 138 P.3d 1210, 1213 (Ariz. App. 2006) (citing Estes Co. v. Aztec Constr. Inc., 677 P.2d 939, 941 (Ariz. App. 1983).  See also 6-26 Corbin on Contracts § 573 ("When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.")  The contract specifies that the time performance "of the work forming a part of this Subcontract is as and when directed by Contractor as modified from time to time."  Haydon's Ex. A, Sec. 4 (Doc. 168).  Further,

the scope of work to be completed does include installation of irrigation sleeves.  Thus, according to the plain terms of the contract, the work was covered.

Western contends that the installation was done on an emergency basis, "performed at the sole discretion and at the sole direction of Haydon Construction," and that Haydon falsely represented that Western would be added to Haydon's Blue Stake statement.  While those points, if found accurate, may go to the negligence of Haydon (though, as discussed *supra*, it does not appear that Haydon exercised control of the means and methods of Western's work), they do not alter the plain terms of the contract. Given that the time of performance was already specified to be variable and subject to change based on the Contractor's determination and given that the Contract made provisions for the work Haydon did, it did, indeed, cover the work done in this case.

Western further argues that Haydon does not come under the contractual indemnity provision because the cable was cut do to Haydon's "sole negligence."  Under Arizona law, a construction contract "that purports to indemnify . . . the promisee from or against liability for loss or damage resulting from the sole negligence of the promisee" is void.  As discussed above, there is no genuine issue of material fact as to Western's negligence. A.R.S. § 32-1159.  Therefore, Haydon was not solely negligent.  The indemnity provision is not void on grounds of public policy.

Accordingly, Western must indemnify Haydon for the money it has already spent defending against this suit and has a duty to defend going forward.

## H. Western and Haydon's Breach of Contract Claims

Haydon has brought a cross-claim against Western for breach of the written contract between the two parties.  Western has brought a cross-claim against Haydon for breach of the implied or oral contract it claims governed the work at issue.  As discussed above, the written contract governed the work done; accordingly, Haydon's Motion for Summary Judgment on Western's Cross Claim must be granted due to Western's failure to indemnify Haydon as per the contractual provisions.

## I. Loss of Use Damages

In the absence of legal authority to the contrary, Arizona courts follow the Restatement (Second) of Torts.  Section 928 provides for loss of use damages "[w]hen one is entitled to a judgment for harm to chattels not amounting to a total destruction in value."  See also Max v. Switz v. Allright Corp., 930 P.2d 1010, 1013 (Ariz. App. 1997); Farmers Ins. Co. v. R.B.L. Inv. Co., 675 P.2d 1381, 1383 (Ariz. App. 1983).  These damages are well established in American law (and, in fact, the ancient British jurisprudence from whence it came).  See, e.g., The Potomac, 105 U.S. 630 (1881) (holding "[i]n order to make full compensation and indemnity for what has been lost by the collision, *restitutio in integrum*, the owners of the injured vessel are entitled to recover for the loss of her use, while laid up for repairs."

An Illinois Court found that the appropriate measure of damages was the "reasonable rental of a substitute cable."  MCI Worldcom Network Services v. Atlas Excavating, Inc., No. 02 C 4394, 2006 U.S. Dist. Lexis 88956 at *26 (N.D. Ill. 2006).  See also MCI Worldcom Network Services v. Kramer Tree Specialists, No. 02 C 7150, 2003 U.S. Dist. Lexis 10542 at * 8 (N.D. Ill. 2003) (holding in an analogous case that "MCI [was] entitled to recover loss of use damages based on reasonable rental value for Kramer's severance of its fiber optic cable.").  A Florida court concurred that, under Florida law, rental value was the appropriate measure.  AT&T Corp. v. Lanzo Construction Co., 74 F. Supp. 2d 1223, 1225 (S.D. Fla. 1999).  Meanwhile, a Connecticut court noted that Connecticut law specifically holds that "rental value will not furnish the measure of damages for loss of use;" accordingly, loss of use damages were the rental value of the cable minus depreciation and wear and tear.  Plaintiff must provide evidence of the amount of that depreciation or recover only a nominal sum.  American Tel. & Tel. Co. v. Connecticut Light & Power Co., 470 F. Supp. 105, 109 (1979).

There is precedence in Arizona of awarding market rental value as loss of use.  Anderson v. Alabama Freight Lines, 169 P.2d 865, 867, 869 (Ariz. 1946) (holding that a trial court did not err in awarding fair rental value for loss of use of a truck); Aries v.

Palmer Johnson, Inc. 735 P.2d 1373, 1382 (finding reasonable rental value appropriate in a UCC context).  Given the lack of authority for a deduction due to depreciation or wear and tear as in Connecticut law and given the apparent general trend towards rental value in similar circumstances, that is the appropriate measure in this instance.

Western argues that Sprint is not entitled to loss of use damages because it had a redundant system that meant service was not disrupted.  In the ordinary course of things, this would not be a bar to recovery.  Courts have not required that a substitute actually have been "rented" (or the equivalent) in order for damages to be granted as "[t]hose who could not afford to advance the money would be unfairly prejudiced."  Fairchild v. Keene, 416 N.E.2d 748, 749 (Ill. App. Ct. 1981).  In Brooklyn Eastern Dist. Terminal v. U.S., 287 U.S. 170 (1932), the Supreme Court held that having pre-obtained an emergency back-up was no bar to recovery of loss of use damages.  Id. at 176-77 (writing that "[if] no such [back-up] boat had been maintained, another might have been hired, and the hire charged as an expense.  The result is all one whether the substitute is acquired before the event or after.")   Where a company had a redundant back-up cable, several courts have found that loss-of-use damages are appropriate.  An Illinois federal court found that because the "plaintiff's redundant capacity was used for emergency purposes only, and not in its generally business," because of the competitive nature of the business, and because "inherent value was lost during the time that the redundant capacity was acting as a backup for the cable," the plaintiff was "entitled to loss-of-use damages."  MCI Worldcom Network Services v. Atlas Excavating, Inc., No. 02 C 4394, 2006 U.S. Dist. Lexis 88956 at *23-24 (N.D. Ill. 2006).

Here, however, there is an additional twist.  Western argues that "the network is defined as a SONET network and a SONET network by definition has at least two transmission paths around a ring.  Because it has two paths automatically, the network includes those two paths and it would not be building twice the network.  The redundant system is merely a system that is required by with [sic] the telephone industry standards."  This situation seems analogous to that in Brooklyn Eastern, in which the Supreme Court

noted that the loss-of-use doctrine has not been extended "to boats acquired and maintained for the general uses of the business." Id. at 177.  That is, when, instead of hiring a tug to replace the one out of commission, the tug boat company was able to do the job with only  the two tugs remaining, it was not entitled to loss-of-use damages.  Id. Sprint, however, notes that it did, indeed, use dedicated, spare restoration capacity.  It writes in it's Additional Material Facts that "[i]n order to have a ring system or a 1+1 system to reroute traffic at a system level, Sprint was required to construct or obtain, and must operate and maintain, a network of twice the cables and/or capacity Sprint would otherwise need."  ¶ 55.  Sprint provides admissible evidence, in the form of the Declaration of Arch A. York, that "Sprint was able to protect the public and some of its customers by rerouting a portion of that traffic to spare, protect paths and/or dedicated restoration capacity on other cables in its network," and further that "at least one Sprint customer, a major bank, was impacted as a result of the April 11, 2005, severance of Sprint's cable."  Dec. of Arch A. York, Ex. 7, ¶ 19 (Doc. 178).  If this is the case, Sprint did suffer actual loss of use damages and may have utilized capacity that existed solely as a back-up.  Accordingly, there is a genuine issue of material fact as to whether Sprint is entitled to loss-of-use damages.

Accordingly,

**IT IS ORDERED** Sprint's Motion for Partial Summary Judgment (Doc. 156) is **GRANTED IN PART** and **DENIED IN PART** in accordance with this opinion.

**IT IS FURTHER ORDERED** Haydon's Motion for Summary Judgment (Doc. 159) is **GRANTED IN PART** and **DENIED IN PART** in accordance with this opinion.

**IT IS FURTHER ORDERED** Western's Motion for Summary Judgment (Doc. 164) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED FURTHER ORDERED** the parties submit a *Joint Statement of the Case*, no more than two short paragraphs.

**IT IS FURTHER ORDERED** the parties shall review the Court's standard Juror Questionnaire (available on the Court's website) and submit **NO MORE THAN FIVE PROPOSED QUESTIONS EACH** (or ten jointly) to be added to the standard Juror Questionnaire with the Court's approval no later than **April 24, 2009.**

**IT IS FURTHER ORDERED** the parties resubmit proposed Jury Instructions in compliance with the procedures available on the Court's website, including but not limited to: a *joint* set of proposed jury instructions where the parties' instructions agree, a separate set of instructions (one for each party) where the parties do not agree, and legal authority supporting all proposed instructions whether the parties agree or not no later than **April 2, 2009.**

**IT IS FURTHER ORDERED** the parties  provide the Court with excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website, including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer.  If either party objects to the proposed testimony, an explanation of the objections is to be set forth independently and appended to the depositions no later than **April 2, 2009.**

**IT IS FURTHER ORDERED** all Motions in Limine are due 30 days from the date of this Order.  Responses are due ten days afterward.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order is due **April 2, 2009**.

**IT IS FURTHER ORDERED** the parties are to file the proposed trial schedule no later than **May 8, 2009.**

**IT IS FURTHER ORDERED** a final pretrial conference is set for **May 22, 2009 at 1:30 P.M.**

**IT IS FURTHER ORDERED** a Status Hearing to review Juror Questionnaires is set for **May 26, 2009 at 3:00 P.M.**

**IT IS FURTHER ORDERED** Trial shall begin on **May 27, 2009 at 8:30 A.M.**

DATED this 6th day of March, 2009.

Roslyn O. Silver
United States District Judge